**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **THE UNITED STATES OF AMERICA,** | § | |
| | § | |
| **v.** | § | **CASE NO. 4:16-cr-89** |
| | § | |
| **RYAN LEE HASTINGS** | § | |

## REPORT AND RECOMMENDATION

Before the Court is Defendant's Motion to Suppress (Dkt. 21). After consideration of the motion and the Government's response, testimony, and argument at hearings conducted on November 21, 2016, and November 29, 2016, and additional briefings presented to the Court, the Court recommends that Defendant's motion be GRANTED.

## I.     RELEVANT FACTS

On the morning of June 10, 2016, Wade Robert Hastings ("Mr. Hastings") contacted McKinney Police Department ("McKinney P.D.") out of concern for his son, Ryan Lee Hastings ("Defendant"), who appeared to have gone missing that morning. Mr. Hastings explained to the McKinney P.D. that his son had some history of mental illness, and although he spent the night at the family's house, he had not shown up for work that morning and several of his son's possessions, including a laptop, rifle, and ammunition, were missing, suggesting that he may have left town. *See* 2nd Hrg. Trans. 99:16-101:23, 108:18-109:2, 132:11-13.[1] In searching through his memory, Mr. Hastings tried to think of anything that might provide some insight in helping to find his son, and, amongst other things, mentioned an exchange he had with Defendant, six (6) months prior:

---

[1] "1st Hrg. Trans." Refers to the transcript of the November 21st proceeding and "2nd Hrg. Trans." Refers to the transcript of the November 29th proceeding.

> A: [Defendant] said, "It's a good thing, you know, God spoke to me last night because I was thinking about shooting a presidential candidate. But now I have a purpose or a new direction and I'm going to, you know, create a series."
>
> Q: Okay, and what series are we talking about?
>
> A: It would be an animated idea that he had, it would be Christian-based, and it would be a series of animated characters in a storyline and whatnot.

*See* 2nd Hrg. Trans. 102:11-104:4. Following these conversations, the McKinney P.D. contacted the U.S. Secret Service ("USSS"). USSS checked their database and discovered that Defendant was "of record" from June 2012, approximately four (4) years prior, when Defendant had expressed a desire to call public attention to what he viewed as a degradation of Christian values in America by placing, as a symbol, a burning cross at the gates of the White House. *See* 2nd Hrg. Trans. 5:13-22. Defendant anticipated being martyred because he would carry weapons in his hands to demonstrate the seriousness of his message. *See* 2nd Hrg. Trans. 140:17-141:6. USSS documents indicated that no evidence was discovered that suggested Defendant posed a threat to the President of the United States or any other protectee and that, if he had carried his plans out, they would have only resulted in self harm. *See* 2nd Hrg. Trans. 29:3-9. Of his own volition, Defendant had second thoughts and, though he had driven out of town, he turned around and returned home, abandoning his attempt to go to the White House in 2012. *See* 2nd Hrg. Trans. 24:22-26:11.

USSS Special Agent Todd Kinkle was notified of Defendant's disappearance and contacted Mr. Hastings. *See* 2nd Hrg. Trans. 31:3-5. They had several conversations throughout the day of June 10, 2016, working through anything Mr. Hastings could think of that might be helpful, going through Defendant's possessions, and answering questions from Agent Kinkle. *See* 2nd Hrg. Trans. 6:13-15, 109:10-113:9.

The USSS distributed a "Nationwide Lookout" (or "BOLO," standing for "be on the look-out") for Defendant. *See* Dkt. 24 at Ex. A. The BOLO stated that Defendant was possibly armed and noted that he suffers from mental illness, in the past had discussed suicide, and his father believed he wanted to be killed by law enforcement. *See* Dkt. 24 at Ex. A. It further included a brief description of Defendant's aborted plans to make a political statement in 2012, his six-month-old conversation with his father, and his personal support for Donald Trump and general dislike for Hillary Clinton and President Barack Obama. *See* Dkt. 24 at Ex. A.

Later that same day of June 10, 2016, and continuing into June 11, 2016, Defendant resumed communications via text messages with his mother and family, and Defendants' parents immediately forwarded these communications to the McKinney P.D. and to Agent Kinkle. *See* 2nd Trans. 115:2-5, 18-22. The messages conveyed Defendant's frustration with his medications, a lack of peace and feeling like a burden to those around him, and a feeling that he wanted to die. *See* Dkt. 33 at Ex. 7, pp. 8-10.

USSS attempted to use Defendant's cell phone number to locate him, but due to an error, investigated the wrong number—a number that pointed to a location in San Antonio. *See* 2nd Hrg. Trans. 43:22-44:9. USSS attempted to get a warrant with their information in San Antonio, but were unable to do so. Mr. Hastings noted that Agent Kinkle told him they were unable to get a warrant because the six-month-old conversation was not relevant. *See* 2nd Hrg. Trans. 112:3-11.

At 12:33 p.m. on June 11, 2016, Defendant texted his mother and stated he was in "Joplin, MI," and was coming home. *See* Dkt. 33, Ex. 7 at p. 15. He initially estimated that he would be home around 5:00 p.m. that evening, but later felt he was too exhausted

to complete the trip and decided to stop at a hotel to rest before he finished the drive home. *See* Dkt. 33, Ex. 7 at pp. 16 -17. Defendant confirmed to his mother that he was fine, but in need of rest. *Id.* Defendant also informed his mother that he was resting at a Holiday Inn in Pryor, Oklahoma, but that he would drive home soon. *See* Dkt. 33, Ex. 7 at pp. 17-19. The Hastings family immediately relayed this information to Agent Kinkle and the McKinney P.D. *See* 2nd Hrg. Trans. 62:20-22; 119:7-9. Agent Kinkle communicated to the family that, given the circumstances, he thought the best plan of action would be to wait until Defendant rested and drove home so that he could interview Defendant in a familiar and comfortable environment. *See* 2nd Hrg. Trans. 69:16-20. Agent Kinkle, who was the case agent for Defendant, stated that he had not intended to arrest Defendant, and in fact testified that, with the information they had at that time, there was nothing to prosecute. *See* 2nd Hrg. Trans. 67:20-22.

USSS Special Agent Roy Ward, operating in Tulsa, Oklahoma at the time, testified that around 4:00 or 5:00 p.m. on June 11, 2016, he was contacted by his supervisor regarding a call from the Dallas USSS office. *See* 1st Hrg. Trans. 70:7-21. Agent Ward testified that the resident agent in charge, Ted Meliga, told him Defendant was possibly in Pryor and, instead of waiting until Defendant arrived home, requested that Agent Ward locate and interview him as soon as possible. *See* 1st Hrg. Trans. 79:17-80:4. Agent Ward testified that Meliga's specific instructions did not have anything to do with making sure Defendant was okay, but were orders to locate Defendant, take him into custody, and interview him. *See* 1st Hrg. Trans. 80:10-13.

As a result of Agent Meliga's directive, Agent Ward communicated with Pryor Police Department ("Pryor P.D.") in Mayes County that Defendant was at the Holiday

Inn in Pryor and provided the BOLO. *See* 1st Hrg. Trans. 71:25-72:7. He directed the Pryor police to apprehend Defendant or take him into custody, and to wait for the USSS to interview him. *See* 2nd Hrg. Trans. 69:2-14. At no time did the USSS seek or evidently consider a warrant for the arrest that was ultimately directed.

Pryor P.D. Officer Chris Penland testified that he was contacted by dispatch and directed to detain Defendant and wait until Secret Service arrived to question him. *See* 1st Hrg. Trans. 22:19. In accordance with the information provided by Defendant, Officer Penland identified Defendant's vehicle at a Holiday Inn, just outside of Pryor city limits, in Mayes County. *See* 1st Hrg. Trans. 9:9-18.

Pryor P.D. Officer Nathan Reed testified to receiving direction via dispatch to go to the Holiday Inn. Reed testified that his main concern was officer safety and the welfare of others, but that this was not a normal welfare check where officers merely determine whether someone is alive. *See* 1st Hrg. Trans. 57:12-58:1. Officer Reed acknowledged that the only information he had was that there was an individual with a nationwide BOLO and USSS wanted the officers to locate that individual and take him into custody. *See* 1st Hrg. Trans. 60:5-9. No Pryor P.D. officer offered testimony regarding any effort to obtain a warrant or contemporaneous reason/discussion about not doing so. Rather, Pryor P.D. appears to have taken custody of Defendant based on the directive from the USSS to do so.

As the Holiday Inn was located in Mayes County, Officer Penland requested assistance from the Mayes County Sheriff's Office to assist in their effort to detain Defendant. Deputy Steven Wayne Brown received a call from dispatch to assist. *See* 1st Hrg. Trans. 65:19-21. Deputy Brown testified that after he received a call, he did not see

the BOLO, but contacted Agent Ward to verify the situation and his directives over the phone. *See* 1st Hrg. Trans. 68:14-69:3.

Agent Ward testified that he told the officers to secure Defendant's belongings in the car, and explained that, on calls of this type, any belongings are part of determining and forming a threat assessment. *See* 1st Hrg. Trans. 72:8-20.

Officer Penland testified that once the Mayes County officers arrived, the officers entered the hotel and spoke with the employee at the front desk who told officers that Defendant had checked into his room two (2) hours prior under his own name. *See* 1st Hrg. Trans. 10:3-12. Officer Penland testified that the front desk employee did not have any information regarding Defendant's belongings or his current location. *See* 1st Hrg. Trans. 10:9-12. The employee did advise, however, that the area around Defendant's room was clear of all guests. *See* 1st Hrg. Trans. 11:19-22.

The officers testified that there was no discussion of getting a warrant. *See* 1st Hrg. Trans. 27:21-28:1. Notably, Agent Kinkle testified that, in Oklahoma, the USSS felt they could not secure a warrant based on the evidence they had at that time. *See* 2nd Hrg. Trans. 95:19-96:7. Instead of discussing or pursuing a warrant, the officers asked, and received from the employee, Defendant's room number. They first attempted to call Defendant's room phone, but did not get an answer. *See* 1st Hrg. Trans. 11:11-15. Officer Penland testified that they then requested, and received, a copy of Defendant's room key from the hotel employee and went upstairs to Defendant's door. *See* 1st Hrg. Trans. 11:16-18. Deputy Brown testified that it was his decision to obtain the room key, allegedly for "safety." *See* 1st Hrg. Trans. 68:17-20. Officer Penland, who eventually took the key from Deputy Brown when preparing to enter the hotel room, testified that he

took the key because he had made up his mind that if Defendant did not answer the door, he was going to go in. *See* 1st Hrg. Trans. 27:17-20.

Officer Penland, Officer Nate Reed, Officer Trent Humphrey, and Deputy Steve Brown approached the door of Defendant's room. Officer Penland testified that they did not announce because they were trying for an element of surprise. *See* 1st Hrg. Trans. 13:2-3. The officers covered the peephole and knocked, but did not say anything. *See* 1st Hrg. Trans. 12:12-13:1.[2]

Officer Penland testified that, though he could hear the TV at a loud volume, he heard the doorknob move, and heard what sounded like footsteps walking away from the door. *See* 1st Hrg. Trans. 12:16-13:11. Officer Reed testified that Deputy Brown then handed him the room key and he opened the door with the key. *See* 1st Hrg. Trans. 52:24-25.

The officers testified that Defendant stood at the foot of the bed, and they ordered him to put his hands in the air and sit back down on the bed. *See* 1st Hrg. Trans. 30:25-31:3. They ordered him to lay down on the bed to and roll onto his face then detained him with handcuffs. *See* 1st Hrg. Trans. 14:1-4, 31:4-7. Officer Penland asked Defendant if there were any firearms in the room and Defendant said he had a pistol in his backpack. *See* 1st Hrg. Trans. 14:10-13. Officer Penland testified that he found the backpack and it was zipped closed. *See* 1st Hrg. Trans. 14:22-23. Officer Reed testified as to the same set of events. *See* 1st Hrg. Trans. 53:15-54:11.

Officer Penland noted that Agent Ward ordered the officers to collect Defendant's belongings before they left the hotel room. *See* 1st Hrg. Trans. 15:7-10. The officers

---

[2] The Court notes that the officer's conduct in seeking to "surprise" Defendant is not consistent with a "safety check" or concern for Defendant's well-being.

collected the backpack, two (2) cellphones, a lunchbox, loose change, and a large black duffle bag. *See* 1st Hrg. Trans. 15:11-14. Officer Penland asked Defendant about any other firearms and Defendant told him he had a rifle in his car in the parking lot. *See* 1st Hrg. Trans. 16:14-18. Defendant's vehicle was towed to the Pryor Police Department. *See* 1st Hrg. Trans. 36:4-5.

The officers took Defendant to the Pryor P.D. headquarters and processed him into custody at around 5:00 p.m. *See* 1st Hrg. Trans. 39:19-40:1. Officer Penland testified that Defendant was not under arrest, but rather was "detained" under Secret Service directive until the USSS arrived. *See* 1st Hrg. Trans. 17:8-13.

Officer Penland testified that the officers searched the backpack before they took it into the Pryor Police Department because they were told there was a firearm in the bag and policy dictated that they are to secure all firearms before entering the Pryor Police Department. *See* 1st Hrg. Trans. 42:16-20. Officer Penland examined Defendant's car at the Pryor Police Department, where it was located after it had been towed from the hotel. *See* 1st Hrg. Trans. 36:10-12. Officer Penland testified as to seeing, in plain view, a generic jar or container in Defendant's car with a white lid at the top of a backpack behind the driver's seat. Officer Penland testified that he believed that the container might be an explosive, namely Tannerite. *See* 1st Hrg. Trans. 36:10-38:13. Officer Penland opened and entered the vehicle and determined that the substance was not Tannerite, but located a rifle in the vehicle between the front and back seats, wrapped in a coat. *See* 1st Hrg. Trans. 39:12-13; 42:19-24.

Defendant was locked in a jail cell for approximately four (4) hours until Agent Ward (the Oklahoma-based USSS agent) arrived. Defendant was taken to an interview

room at approximately 9:00 p.m. *See* 1st Hrg. Trans. 40:10-14. Officer Penland and Agent Ward were present in the interview. According to testimony, Defendant's *Miranda* warnings were read to him and presented, Defendant waived his right to an attorney and his right to remain silent, and gave consent to search his cell phone and vehicle. *See* 1st Hrg. Trans. 33:8-34:7. Agent Ward testified that he searched the vehicle after consent was obtained, and discovered several items including notes on scraps of paper that referenced Green Bay, Wisconsin, a Wisconsin hotel, and a GPS device. *See* 1st Hrg. Trans. 75:1-23.

Agent Ward testified that Defendant told him in the interview that he had previously planned to go to Green Bay, Wisconsin to kill President Barack Obama and Hillary Clinton, and during the interview, still expressed a desire to die or to kill other people. *See* 1st Hrg. Trans. 77:7-13.[3] However, when pushed to describe Defendant's state of mind in the interview, Agent Ward testified that, specifically, Defendant was not planning on coming back after committing his act. *See* 1st Hrg. Trans. 78:19-20. Agent Ward acknowledged that he knew in the interview that Defendant was referencing an aborted or past plan because he knew Defendant was already on his way home. *See* 1st Hrg. Trans. 78:21-24. Agent Ward never elaborated on any intentions for violence or suicide made by Defendant outside of his then-aborted plans. After the interview, Agent

---

[3] Officer Penland testified that he had been told via his dispatch that Agent Ward had communicated Defendant was traveling to Green Bay, Wisconsin to kill President Barack Obama and Presidential Candidate Hillary Clinton before they located Defendant. *See* 1st Hrg. Trans. 28:21-29:19. Agent Ward testified that he learned information about Green Bay and potential plans to kill President Obama and Hillary Clinton from Agent Kinkle. *See* 1st Hrg. Trans. 83:1-84:13. Agent Kinkle, however, testified that he had no knowledge of references by Defendant to Hillary Clinton, Barack Obama, or Green Bay, Wisconsin until after Agent Ward interviewed Defendant that evening. *See* 2nd Hrg. Trans. 49:1-50:13. In fact, Agent Kinkle testified that he is certain information regarding specific threats to Barack Obama and Hillary Clinton in Green Bay, Wisconsin came from Defendant's interview, and not before, even though Officer Penland's report and Agent Ward's testimony contradict this statement. *See* 2nd Hrg. Trans. 53:1-4. The Court finds that the testimony of Agent Kinkle is credible, both in substance and as case agent in this matter.

Ward gave a directive to immediately transfer Defendant to a mental health facility. *See* 1st Hrg. Trans. 88:17-25.

Defendant was then transferred to a mental health facility called Alliance Health from which he was subsequently transported to a mental health facility known as Shadow Mountain. *See* 2nd Hrg. Trans. 23:6-8. Defendant was held at Shadow Mountain until June 14, 2016, when he was arrested. *See* 2nd Hrg. Trans. 23:6. The Grand Jury charged that, "[b]eginning in or around January 2016, and continuing through on or about June 11, 2016 . . . Ryan Lee Hastings, knowingly and willfully threatened to kill and inflict bodily harm upon Hillary Clinton, a major candidate for the office of President of the United States, by threatening to shoot her with a firearm." *See* Dkt. 1.

On October 31, 2016, Defendant filed the present Motion to Suppress, requesting the Court to suppress and exclude "all evidence, physical and testimonial, obtained or derived from or through or as a result of the unlawful search, seizure, interrogation, arrest and detention of Defendant which occurred on June 11, 2016 in Pryor, Oklahoma." *See* Dkt. 21 at p. 1. On November 10, 2016, the Government filed a response. *See* Dkt. 24. On November 21, 2016, and November 29, 2016, the Court held hearings on the Motion to Suppress. *See* Dkts. 28, 31; (Transcripts at Dkts. 37, 38). On December 12, 2016, the Government filed supplemental briefing. *See* Dkt. 39. Also on December 12, 2016, the Defendant filed supplemental briefing. *See* Dkt. 40.

## II. <u>ANALYSIS</u>

Defendant's Motion to Suppress concerns fundamental, Constitutional issues of privacy and security. As the Supreme Court has stated, "[b]ecause the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion

stands at the very core of the Fourth Amendment, our cases have firmly established the basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (citations omitted). This case involves intrusion into a hotel room rather than a house, but "[a] hotel room can clearly be the object of Fourth Amendment protection as much as a home or an office." *Hoffa v. United States*, 385 U.S. 293, 301 (1966).

There is no dispute that Defendant had a legitimate expectation of privacy in his hotel room that he had legally registered and paid for, just as he would have in his own home. *See* Dkt. 24 at p. 5. It is uncontested that law enforcement officers entered Defendant's hotel room without a warrant and without Defendant's consent. Once a defendant produces evidence that a search was conducted without a warrant, the burden shifts to the Government to justify the warrantless search. *United States v. Jones*, 234 F.3d 234, 239 (5th Cir. 2000). The Court, therefore, considers whether the Government has met its burden to justify the warrantless search into Defendant's hotel room.

The Government's initial brief originally asserted that exigent circumstances created an exception for warrantless entry. *See* Dkt. 24 at p. 8. Defendant argues that law enforcement officers did not have a constitutionally valid exception to the warrant requirement in order to lawfully enter Defendant's hotel room without a warrant. *See* Dkt. 21 at p. 6; Dkt. 40 at p. 1. In supplemental briefing following hearings on the Motion to Suppress, the Government pivoted to argue that the real purpose of the officers' detention of Defendant was to ensure he was not a danger to himself or others and that their actions were necessary to effectuate this purpose. *See* Dkt. 39 at p. 1. The

Government does not cite to any specific testimony that supports this position and the Court finds none.

**A. The Exigent Circumstances Exception**

Even though presumptively unreasonable, officers' warrantless entry will survive constitutional scrutiny where exigent circumstances justify the intrusion. *See United States v. Menchaca-Castruita*, 587 F.3d 283, 289-90 (5th Cir. 2009). It is the Government's burden to prove the existence of such exigent circumstances. *Id.* at 289. There is not a set formula for determining when circumstances may justify a warrantless entry. Exigent circumstances exist, in general, "when there is a genuine risk that officers or innocent bystanders will be endangered, that suspects will escape, or that evidence will be destroyed if entry is delayed until a warrant can be obtained." *Id.* Courts have often referred to a non-exhaustive list of factors in evaluating if exigent circumstances are present:

> (1) the degree of urgency involved and amount of time necessary to obtain a warrant;
> (2) the reasonable belief that contraband is about to be removed;
> (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought;
> (4) information indicating the possessors of the contraband are aware that the police are on their trail; and
> (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic.

*Id.* at 289-90. Of particular note in this case, "[i]mmediate safety risks to police officers and others are exigent circumstances that may excuse a warrantless entry into a residence." *Gates v. Tex. Dept. of Protective and Regulatory Servs*, 537 F.3d 404, 421 (5th Cir. 2008). Further, "the threat an individual poses to himself may create an exigency that makes the needs of law enforcement so compelling that a warrantless entry

is objectively reasonable under the Fourth Amendment." *Rice v. ReliaStar Life Ins. Co.*, 770 F.3d 1122, 1131 (5th Cir. 2014). The possible threat an individual poses to himself is not a blanket grant, but rather, "[l]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from *imminent* injury." *Rockwell v. Brown*, 664 F.3d 985, 994 (5th Cir. 2011) (emphasis added) (citations omitted).

At issue before the Court is whether the actions of the officers who entered in this case without a warrant were objectively reasonable. *See Rice*, 770 F.3d at 1132. The scene should be considered as it would have appeared to "reasonable and prudent men standing in the shoes of the officers.*" See Menchaca-Castruita*, 587 F.3d at 290. "While avoiding the risk of second-guessing officers' actions based on 20/20 hindsight, [the court] must still ensure that, at the time the officer acted, there was reliable information of an urgent, ongoing emergency." *Rice*, 770 F.3d at 1132 (citation omitted).

The Court begins its analysis with the information available to the officers at the time of the warrantless entry. Officer Penland testified he was contacted by dispatch who instructed him to locate Defendant and Defendant's vehicle, which they believed to be in Pryor. *See* 1st Hrg. Trans. 5:23-6:1. Officer Penland testified that he was advised that when Defendant left his residence in Texas, he left a suicide note. *See* 1st Hrg. Trans. 8:20-21. Yet, Officer Penland described orders that made no reference to the prevention of an imminent suicide, but rather, as conveyed from Agent Ward via Deputy Brown, to make contact with the Defendant, detain him, and to wait until a USSS agent arrived to question him. *See* 1st Hrg. Trans. 22:19-22.

Officer Reed initially testified that he had been made aware by dispatch that Defendant had made threats against the President and was possibly suicidal, but after further questioning, Officer Reed acknowledged that the only information he had actually received was that an individual with a nationwide BOLO was in the area and that USSS wanted the officers to locate that individual and take him into custody. *See* 1st Hrg. Trans. 51:11-15, 60:5-9. Notably, the BOLO only describes that Defendant may be a risk for suicide by cop, not that he was imminently suicidal. Officer Reed explained that he had been called in the past to do "welfare checks," which he defined as ranging dramatically, but focus whether an individual is all right, or if they are suicidal and in need of further interaction and evaluation. *See* 1st Hrg. Trans. 57:14-23. Officer Reed acknowledged that the engagement with Defendant was not a normal welfare check where officers merely were interested in determining whether he was alive. *See* 1st Hrg. Trans. 57:12-58:1. The Court finds the desire to "surprise" Defendant in his hotel room is inconsistent with a welfare check. *See supra* note 2; 1st Hr. Trans. 12:12-13:3.

Deputy Brown testified that he responded to a call "to locate a vehicle, [and a] possible suicidal subject wanting to harm himself and other people." *See* 1st Hrg. Trans. 66:19-22. Deputy Brown stated that he had not seen the BOLO, but had received information from dispatch and contacted Agent Ward (the Oklahoma USSS Agent) to verify the information over the phone. *See* 1st Hrg. Trans. 68:14-69:3. Agent Ward testified that he communicated with the Pryor P.D., describing the information from the BOLO, specifically that Defendant had a possible mental condition, had made threats in the past and was also possibly suicidal. *See* 1st Hrg. Trans. 71:25-72:7. Notably, Agent Ward did not direct the officers to act upon a threat of imminent suicide.

That the BOLO references Defendant may attempt suicide by cop, Officer Penland noted a possible suicide note and Deputy Brown and Officer Reed mentioned that their directives mentioned a "possible" suicidal subject does not give rise to a reasonable belief of an imminent safety risk. In particular, risk of suicide by cop is, by all logic, not an imminent health threat of suicide. The officers' actions, in fact, suggest they did not fear that Defendant was imminently a suicide risk, as no testimony was presented that the officers, upon entering the room, checked to determine whether Defendant had already attempted to overdose, checked for self-inflicted wounds, or otherwise sought information about Defendant's health, safety, or mental condition.

The officers knew Defendant had checked into the hotel under his actual name and that his car was parked in clear view at the hotel. They knew there were no civilians in the rooms near Defendant, they located Defendant's car, and they knew that Defendant was in his room. The Government failed to demonstrate that any threat of injury was "imminent" that could be considered an exigent circumstance. *See Rockwell*, 664 F.3d at 994.

As noted by the Government, it is well settled that exigencies deliberately manufactured by the Government violate the Fourth Amendment, especially if the Government's actions are intentionally taken to avoid the warrant requirement. *See* Dkt. 24 at p. 9, citing *United States v. Rico*, 51 F.3d 495, 502 (5th Cir. 1995). The Government contends that officers were merely responding to a call for assistance in locating a potentially dangerous individual. *See* Dkt. 24 at p. 9. The testimony indicates that the officers were not directed to simply locate Defendant, but were directed to detain Defendant, avoiding any warrant.

When the USSS initially believed Defendant was in San Antonio, they attempted to obtain a warrant, and failed. In Oklahoma, however, no law enforcement sought a warrant. When Agent Kinkle (the Dallas USSS Agent in charge) was asked, if there was no immediate threat, why a warrant was not secured in Oklahoma, Agent Kinkle testified:

> Would we have gotten a warrant based on the—the information we had at the time? We felt we couldn't, based on what—what we knew from Wade Hastings, the father. . . . There was no federal charges that we were looking at; we just wanted to find him and find out what his intentions were.

*See* 2nd Hrg. Trans. 95:19-96:7 (emphasis added).

Agent Ward testified that when there is a "protective intelligence call," and particularly where there is a BOLO, the USSS simply must locate and speak to the individual under investigation, making no reference to warrant requirements or the rights of that individual:

> We have to locate that person. We have to speak to them and determine whether or not they are a threat not only to themselves or others but also the protectees that we're charged with protecting. With regard to their belongings, anything that he had with him is also part of that because that helps us form a more accurate threat assessment of that subject.

*See* 1st Hrg. Trans. 72:8-20. In fact, the officers on the scene testified that, during the entire series of events, there was never even a discussion of obtaining a warrant. *See* 1st Hrg. Trans. 27:21-28:1.

It is under this specific scenario, where reasonable officers would, and in fact do, recognize that a warrant is not legally justified, the Court must be especially on guard to asserted exigencies and exceptions to violations of the Fourth Amendment. In light of the testimony of the officers at the scene and the testimony of Agents Ward and Kinkle, the Court finds that the actions of the officers were objectively unreasonable. The

Government failed to demonstrate that reasonable individuals, standing in the shoes of the officers, would determine there were exigent circumstances that would justify the entry into Defendant's hotel room without a warrant. The information available to the officers at the time they entered into Defendant's hotel room did not present exigent circumstances to justify a warrantless entry. The officers were given and followed a directive from the USSS to detain Defendant for questioning and to seize his belongings, not to intervene in preventing an imminent harm. This seizure and detention was not within an exception to the warrant requirement and, thus, violate Defendant's rights and the Fourth Amendment.

**B. Admissibility of the Collected Evidence**

Having concluded that the entry into Defendant's hotel room was unlawful, the Court turns to the question of the admissibility of evidence collected from the officers' encounter with Defendant. If evidence is obtained in violation of the Fourth Amendment, the exclusionary rule typically precludes its use in a criminal proceeding against the victim of the illegal search and seizure. *See Illinois v. Krull*, 480 U.S. 340, 347 (1987); *Weeks v. United States,* 232 U.S. 383 (1914); *Mapp v. Ohio,* 367 U.S. 643 (1961).

The Government does not focus its supplemental brief on exceptions to a warrantless entry. Rather, the Government devotes the majority of its brief to arguing that, in spite of the exclusionary rule, and regardless of whether or not the officers acted in an unreasonable manner, the evidence gathered should be admissible.

The Government argues that the physical evidence would have been inevitably discovered. *See* Dkt. 39 at p. 1. The inevitable discovery exception "renders the exclusionary rule inapplicable to otherwise suppressible evidence if that evidence would

inevitably have been discovered by lawful means." *United States v. Jackson*, 596 F.3d 236, 241 (5th Cir. 2010) (citation omitted). For the inevitable discovery exception to the exclusionary rule to apply, the Government must prove by a preponderance of the evidence that "(1) there is a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct and (2) the Government was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation." *United States v. Lamas*, 930 F.2d 1099, 1102 (5th Cir. 1991).

The Government does not make an effort to prove either prong. Rather, it merely contends that the officers had been notified that Defendant might be armed and the officers would have been compelled "to frisk the defendant and his immediate surroundings for weapons at any point they encountered him." Dkt. 39 at p. 2. Witnesses testified that a firearm and laptop were found in a zipped backpack, a lunchbox, two (2) cell phones, and a large black duffle bag were found in the room. *See* 1st Hrg. Trans. 14:10-16:6. No assertion was made, however, that Defendant was carrying any of the seized items on his person when they encountered him, nor that he would have been if the officers had engaged him by lawful means.

The Government cites the testimony of Officer Reed, in which he indicated that the officers' normal operating procedure is to secure any weapons in a room once they enter a room under similar circumstances. *See* 1st Hrg. Trans. 54:16-21. Additionally, Officer Penland testified that is standard for police to secure all known firearms before entering into the police department, as they did when they searched Defendant's zipped backpack. *See* 1st Hrg. Trans. 41:16-20. With respect to items located in the vehicle, the

Government states that Officer Penland saw what appeared to be a jar of Tannerite and entered the vehicle for the safety of those in the police station, and had the facts been different, the vehicle arguably would have been subject to an inventory search "once the defendant was transported to the hospital and was not going to be released." Dkt. 39 at p. 3.

The Government fails to assert how any of this evidence would have been discovered by lawful means in the absence of initial police misconduct. The misconduct in this case concerns the warrantless entry into Defendant's hotel room. The Government makes no assertion that this search and seizure qualified for a warrant. In fact, the evidence and testimony suggests that they would <u>not</u> have qualified for a warrant. As previously noted, Agent Kinkle explained the USSS did not feel they had enough evidence to justify a warrant. *See* 2nd Hrg. Trans. 95:19-96:7.

If the officers had not entered the hotel room, there is no evidence to suggest that any of the items would have been legally discovered. Absent police misconduct, there is no reason to believe that Defendant would have directed police to his firearms or given consent to search any of his items. Further, the evidence is not persuasive that the police would have obtained or searched Defendant's vehicle or transported him to the hospital absent the warrantless seizure and detention. Finally, the Government does not demonstrate that any such "inevitable discovery" would have been lawful, only that it could have potentially occurred in pursuance of typical procedures.

Even if the Government could show a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct, it wholly fails to demonstrate that the Government was actively pursuing a

substantial alternate line of investigation at the time of the constitutional violation. The only line of investigation that could even possibly be considered "alternate" was Agent Kinkle's interest in interviewing, but not arresting or detaining, Defendant in his home after Defendant completed his drive back to Texas. This plan, however, was abandoned once USSS directed the Pryor P.D. to find Defendant and to apprehend him or take him into custody, and wait for USSS to interview him. *See* 2nd Hrg. Trans. 69:2-14. Agent Kinkle testified that his plan was overruled because, if they did not interview Defendant in Oklahoma, the USSS "might miss an opportunity for him to tell [them] what was going on, [and] that he may not talk." *See* 2nd Hrg. Trans. 70:4-71:14. No suggestion was made that Agent Kinkle's plan was to be pursued alternatively. The Government, therefore, fails to meet its burden to prove by a preponderance of the evidence that it was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation.

Having failed to show by a preponderance of the evidence that there is a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct and that the Government was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation, the Court finds that an exception to the exclusionary rule does not apply to any of the items at issue on the grounds of inevitable discovery.

### C. Admissibility of Defendant's Testimony

The Government pursues a different line of argument regarding the statements made by Defendant in his interview with Agent Ward. The Government argues that

Defendant's statements were made voluntarily, and should therefore not be suppressed or excluded.

"[T]he exclusionary rule prohibits the introduction at trial of all evidence that is derivative of an illegal search, or evidence known as the 'fruit of the poisonous tree.'" *United States v. Singh,* 261 F.3d 530, 535 (5th Cir. 2001). Verbal statements are subject to the exclusionary rule just as is physical evidence. *Wong Sun v. United States*, 371 U.S. 471, 485-86 (1963). The Supreme Court has identified several factors that should be considered in determining whether a confession has been purged of the taint of the illegal arrest: "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct." *Taylor v. Alabama*, 457 U.S. 687, 689 (1982) (citations omitted). The State bears the burden of proving that a confession is admissible. *Id.*

The Government argues that there was ample time between Defendant's initial detention and his interview statements, notes that he was given *Miranda* warnings, argues that there were intervening circumstances, and that the officers' conduct was not flagrant. *See* Dkt. 39 at p. 3. The Court is not persuaded.

1. Temporal Gap

The Government argues that the several hours that passed from Defendant's initial detainment before his interview and statements, constitutes ample time such that his statements should not be considered tainted by his initial detainment. *See* Dkt. 39 at p. 3. According to testimony, approximately four (4) hours passed from Defendant's detainment in a cell and his interview with Agent Ward.

There is no strict time between illegal conduct and consent that would serve to either validate or invalidate the consent. *United States v. Montgomery*, 777 F.3d 269, 273 (5th Cir. 2015). In *Taylor v. Alabama*, the Supreme Court found that a confession six (6) hours after an illegal arrest was not purged of taint of illegal arrest. 457 U.S. 687, 700 (1982). In the opinion, the Supreme Court cited, in affirmation, a statement made by Justice Stevens in his concurring opinion in *Dunaway v. New York*, 442 U.S. 200, 220 (1979), that the "temporal relationship between the arrest and the confession may be an ambiguous factor." *Id*. The Supreme Court opined that "a lengthy detention could be used to exploit an illegal arrest at least as easily as a brief detention," and in the case of a six-hour gap, they determined that there was "nothing remarkable, one way or the other, about the length of detention." *Id.*

Here, the Court finds that there was nothing remarkable about the four (4) hours Defendant was held in his cell before his interview. There is no reason to find that this amount of time was either coercive or sufficiently removed to find that Defendant's statements were voluntary. The Court does not find that this factor weighs against suppression.

### 2. *Miranda* Warnings and Intervening Circumstances

The Government notes Defendant was given his *Miranda* warnings, and, along with other "intervening events" such as Defendant answering questions while handcuffed in the hotel room about the presence of weapons and his iPhone passcode, demonstrated a "rather slow and steady progression of events that [Defendant] would have been familiar with based on his previous encounters with police, and he had ample time to consider his option to talk to the police." Dkt. 39 at p. 4. *Miranda* warnings are an important factor to

consider in determining whether a statement is voluntary. *See United States v. Hernandez*, 670 F.3d 616, 620–21 (5th Cir. 2012). However, if *Miranda* warnings were viewed as a talisman that cured all Fourth Amendment violations, "then the constitutional guarantee against unlawful searches and seizures would be reduced to a mere 'form of words.'" *Taylor*, 457 U.S. at 690 (citing *Mapp v. Ohio*, 367 U.S. 643, 648 (1961)).

"Intervening events of significance" that may suggest a voluntary statement include, for example, an appearance before a magistrate judge or consultation with an attorney. *See Johnson v. Louisiana,* 406 U.S. 356, 365 (1972). Questioning a suspect, as was done in this case in the hotel room, is insufficient in and of itself to constitute an "intervening event of significance." *See Brown v. Illinois,* 422 U.S. 590, 602-05 (following illegal arrest, no intervening circumstances when police gave *Miranda* warnings and questioned him before defendant confessed); *see also, Dunaway*, 442 U.S. at 218-19 (following illegal arrest, no intervening circumstances where defendant was given *Miranda* warnings and questioned before making incriminating statements).

In *Taylor*, the Supreme Court determined that the petitioner was arrested without probable cause in the hope that something would turn up, and he confessed shortly thereafter without any meaningful intervening event. *Taylor*, 457 U.S. at 692. There, petitioner was in police custody, was unrepresented by counsel, and he was questioned on several occasions, fingerprinted, and subjected to a lineup. *Id.* The respondent argued that the petitioner had every opportunity to consider his situation, to organize his thoughts, to contemplate his constitutional rights, and to exercise his free will and argued several "intervening events" were sufficient to break the connection between the illegal arrest and petitioner's confession, such as the fact that petitioner was given *Miranda* warnings

three (3) times. *Id*. The Supreme Court rejected these arguments and found that the respondent failed to demonstrate an intervening event of significance to justify an exception to the exclusionary rule.

Similarly, the Court here does not find that the mere questioning of Defendant when he was detained in the hotel room, or the fact that he was given *Miranda* warnings several hours later, are sufficient to demonstrate an intervening event such that it could be said that Defendant made his statements of his own free will. Defendant was unrepresented by counsel, he was asked questions regarding firearms and passwords while restrained in a hotel room that had been abruptly intruded into by officers without announcement or warrant, and was presented with *Miranda* warnings some four (4) hours after being detained in a cell at the police station without the freedom to leave. Further, through the illegal entry into Defendant's hotel room, the officers discovered a firearm and seized his belongings, which may have been incriminating, such that Defendant may have felt he could not avoid self-incrimination. All of these items weigh in favor of a determination that there was not an intervening event that would purge the taint of the illegal entry. Although he was read *Miranda* warnings at a point following detainment, as in other cases, this fact is insufficient to justify the admission of Defendant's statements.

3.  Flagrance of Officers' Conduct

While the Court previously examined the objective reasonableness of the entry into Defendant's hotel room, the Court now considers the flagrance of the actual officers involved. The Court concludes that Officer Penland and Agent Ward's testimonies and reports that part of the justification for detaining Defendant was information that Defendant was traveling to Green Bay, Wisconsin to kill President Barack Obama and

Presidential Candidate Hillary Clinton are not credible. *See* 1st Hrg. Trans. 28:21-29:19.

Agent Kinkle testified, and the Court finds credible, that these specifics were not known until after Defendant's interview, which Agent Ward conducted with Officer Penland in the room. *See* 2nd Hrg. Trans. 49:1-50:13. This inconsistency reflects, at best, a carelessness with the reporting and testimony of information relevant to the determination of Defendant's Motion to Suppress, and worst, an *ex post* justification for Constitutionally impermissible search and seizure.

Additionally, the officers reflected a lack of concern for Defendant's Fourth Amendment rights, not even discussing obtaining a warrant at any point before entering his hotel room. Moreover, Agent Kinkle acknowledged that the USSS did not feel they had enough evidence to obtain a warrant. *See* 2nd Hrg. Trans. 95:19-96:7. The officers, instead of demonstrating an appreciation for Defendant's rights, acted on generalizations that Defendant was reported to be dangerous, and that he had to be detained in order for the USSS to talk to him. As previously discussed, Agent Ward testified that he directed the officers to secure Defendant and his belongings, stating, regarding a "protective intelligence call," particularly where there is a BOLO:

> We have to locate that person. We have to speak to them and determine whether or not they are a threat not only to themselves or others but also the protectees that we're charged with protecting. With regard to their belongings, anything that he had with him is also part of that because that helps us form a more accurate threat assessment of that subject.

*See* 1st Hrg. Trans. 72:13-20. Notably, Agent Ward did not direct officers to make sure Defendant was well, in accordance with an idea that he could be suicidal, but rather, to locate Defendant and his belongings and take him into custody so that he could interview him.

The officers obtained and used a key to Defendant's hotel room. While taking place in a hotel, this action is not unlike obtaining the key to a home and entering the house after a knock at the door where the individual inside does not open the door. There was no announcement, merely a knock, and then an entry.

After being detained in a cell without being allowed to leave, Defendant was interviewed by Agent Ward. Defendant was read and presented with a *Miranda* form, but was questioned and immediately referred for mental help after the interview. When asked if, during the course of the questioning, Agent Ward had some thought that Defendant needed mental help, he confirmed that he always has that thought on protective intelligence calls. *See* 1st Hrg. Trans. 89:9-13. When asked, why, at the moment he felt Defendant needed mental help, did he not call off the interview, but rather continued in activities that included obtaining a statement and consent to search forms, he stated: "The Secret Service has to talk to a person. If they make a threat, we have to talk to them whether or not they are mentally ill or not, sir." *See* 1st Hrg. Trans. 89:14-17.[4]

In this case, the officers effectuated an investigatory detainment based on USSS directives rather than probable cause and without even discussion of obtaining a warrant. They transported and detained Defendant for questioning for the USSS, seized his possessions, opened and searched his zipped backpack and locked car. The USSS appears to have given its directives with the specific belief that they did not have evidence to justify a warrant, but ordered the officers to seize Defendant and his possessions without regard to the fact that Defendant was lawfully staying in a hotel room. The detainment culminated with an interview, of which Agent Ward admitted that, though he felt

---

[4] The Court notes, however, that there was no evidence of a contemporaneous threat by Defendant prior to his illegal detention—only a stale six (6) month old comment to Defendant's father.

Defendant needed mental help, he conducted the interview anyway and took waivers from Defendant.

That the police did not physically abuse Defendant or act with some malice does not negate the flagrancy of the officers' actions. The Government argues that there was no "dramatic siege, no special tactics deployed, no allegation of mistreatment or denial of basic human rights." Dkt. 39 at p. 5. This does not cure the illegality of the initial entry into Defendant's hotel room. Further, the testimonies of the officers on the scene and the USSS agents indicate that the entire series of events was conducted with a plain lack of concern for Defendant's Fourth Amendment rights. This factor weighs for suppression.

When considering all factors, the Government fails to meet its burden of proving that Defendant's statements are admissible.

### III.   CONCLUSION

The Court considers whether the purposes of the exclusionary rule would be served by suppressing the evidence. If the Court was to find that the evidence and statements are admissible, police officers would be encouraged to conduct illegal searches and seizures at the direction of USSS agents without consideration of an individual's Fourth Amendment rights or the presence of probable cause in the hopes that they might find incriminating evidence or obtain a confession.

The underlying evidence supporting the entry into Defendant's hotel room was based on ownership and possession of a firearm, mere suspicion of mental instability, and statements from Defendant's father concerning a single stale conversation six (6) months prior. Once the officers located Defendant, there was no indication of imminent danger to the public, to officers, or to Defendant himself. Accordingly, the Court finds that the

exclusionary rule applies and recommends that all evidence, physical and testimonial, obtained or derived from or through or as a result of the unlawful search, seizure, interrogation, arrest and detention of Defendant which occurred on June 11, 2016, in Pryor, Oklahoma be suppressed and excluded.

The Court **RECOMMENDS** that Defendant's Motion to Suppress (Dkt. 21) be **GRANTED**.

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C).

A party is entitled to a *de novo* review by the district court of the findings and conclusions contained in this report only if specific objections are made, and failure to timely file written objections to any proposed findings, conclusions, and recommendations contained in this report shall bar an aggrieved party from appellate review of those factual findings and legal conclusions accepted by the district court, except on grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C.A. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 20th day of January, 2017.**

_____
KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE